14-5535 USA v. Birdie Anderson. Oral argument, 15 minutes per side. Mr. Brandon for the appellant. May it please the court, my name is Andrew Brandon. I'm here today on behalf of Birdie Anderson. I've already requested three minutes for proceed. Thank you, your honors. The sophisticated means enhancement is specifically defined in the guidelines as requiring especially complex or especially intricate behavior, especially intricate criminal conduct. In this case, the district court applied that enhancement despite the fact that it specifically found that Ms. Anderson's behavior was not what it did was particularly intricate. It did so based on a misreading of the law in which it determined that almost every crime or almost every fraud receives the sophisticated means enhancement. This was error, your honors. Now, the government has raised the important question of what kind of error is that, specifically the standard of review question. The government's other guidelines, excuse me, unlike the other guidelines enhancements, the sophisticated means enhancement gets a special sort of down the line clear error standard where both the facts and the law are reviewed for clear error. There's simply no reason to apply such a standard. In this case, there's nothing special about the sophisticated means enhancement. Some courts have correctly noted that sophisticated means is an essentially factual issue. I mean, it is certainly a heavily fact-based issue, and therefore, much of the analysis is going to be for clear error. My sense is, and please correct me if I'm wrong, that your argument is more challenging the guideline, and that the sense I got from your brief was that you think the court simply applied the wrong standard, had sort of the wrong threshold as an interpretive matter in its application of the enhancement. Yes, your honor. I think there are one or two facts that we would quibble with, but for the most part, the question is the court's determination of a sort of spectrum of conduct where, using the two examples, where the first example sort of sets a bottom, a floor, if you will, for the enhancement, above which almost all fraud cases sit. And for that reason, I think, just to briefly return to the clear error issue, there's no reason to apply a clear error standard of review to that explicitly legal analysis. Now, when the court starts to apply that to the facts, then, of course, we would defer to the court considerably more. How about when he says, you know, he goes through the different parts of this scheme, and he says each one itself wasn't very complex, and it is, frankly, somewhat conclusory, but he says, but taken together, I forget the term he used, but it sort of elevates the complexity or something like that. Yes, he said his term was in tandem. Right. They operate to be more sophisticated. And, I mean, that finding, I guess, do we review for clear error? I think that's an issue I've struggled with in this case. I think that it contains a factual component. It contains a legal component. And I think the courts, the court would say, or the Supreme Court would say, do deference. And I've never been entirely sure what that means either. But jumping into that exact point, I think it's important to note that on a, I want to say, factual but maybe mixed level, the conduct that Ms. Anderson undertook, it doesn't actually work in tandem. I mean, it works in tandem in the sense of one after another, but not in the sense of two bicyclists peddling together, if you will. Her conduct doesn't compound or doesn't sort of build on itself. It just goes sequentially. I mean, she essentially just asks the VA for money once and then again and then again. And each of her – Didn't she kind of use some of that money to do other things? It sure looks like it, Your Honor. It sure looks like it from what I could tell in the record. But my bigger question is this. If we say that they shouldn't have given the two-level enhancement, her guideline range, her offense level would have been 17. Her guideline range would be 24 to, I think his probation said 30 months. Yes, Your Honor. And then Judge Campbell says it's 19, departs downward and gives her 24 months. What difference does it make? Yes, and – I mean, really and truthfully, what difference does it make? Well, Your Honor, the government has made that harmless error assertion and has relied on the – Well, okay, let's be very candid. Suppose we send it back to say you screwed up. What's Judge Campbell going to do? He's going to say 17, 24 to 30 months. 24 months, I thought that was sufficient but not greater than necessary. And so what's the result going to be? Well, I disagree with the assumption just in the sense that I believe the case law and the case law that the government has cited requires that we be certain as to how the district court would have acted if it had not taken – The district court made a finding, made a finding, departed downward, made a finding that this sentence would be sufficient but not greater than necessary in this case. Now, what's he going to say the next time? Well, Your Honor, I think – I mean, how's he going to – I mean, help me. Under 3553A, the district court always has to make a finding that it's – makes a finding that's exactly correct, and he made it in this case. But that doesn't mean that you can never appeal an erroneous application of a guideline. No, but if he's departed downward to basically did what the old district judge trick is, I don't think I'm going to – I don't know about this decision, but I'm going to give you the bottom end of what your guidelines would have been. That is factually what he did, but in this case, because the district court based his downward variance on five or six different factors, only one of which was the fact that Ms. Anderson's conduct, as he specifically found, was not terribly complex, there is absolutely no way we can know – I mean, if he had said that fact alone brings me down this far, then I agree that we could be – that that sort of harmless error could apply. What other factors would change of those factors that he did an analysis of? What – how would they have changed? The only change would be the fact that you shouldn't have used the two-level enhancement, which he basically found was reason to depart downward anyway. Yes, Your Honor. I don't believe that any of the other factors would change, but you would obviously have a different starting point from which to launch your variance. A starting point of 30 months? I mean, yes, clearly you would jump down to the new guideline range, but the court might see fit to say this is not – you know, my sort of unique mix of guideline – or, excuse me, of sentencing factors, 3553A factors, is now off, and it's just not the same. And the cases from this court, such as the McFaul's opinion, have said that this is a very delicate balance, that you've got to go back and look when things change, because the courts are doing, as Your Honor knows, a very sort of delicate balancing act in the sentencing process, and so it's just not certain at all what it would have been. Can you – I mean, are there any cases you can point us to that would have a similar scenario to the one that you would advocate here? In other words, where an enhancement's applied, the court, after the application, says, you know, my hands were tied perhaps on that enhancement, but I just think it's kind of going overboard to apply that enhancement in earnest here, and then the court ultimately gives a sentence that's at the low end of the unenhanced guidelines range. I mean, is there a case that you can point us to? Your Honor, I don't have the silver bullet case on that, but I would just again point out that in the Bacon opinion, for instance, that the government cites too, that is a somewhat unusual case in and of itself for that harmless error principle, and it's highly qualified. I mean, it says the parties didn't disagree with this analysis, this harmless error analysis. It says that here we have absolute certainty because in that case, the court specifically said, you know, this is what I would have done anyway, and so here we don't have that. And so I think just going back to sort of basic sentencing principles of, you know, trying to get the guideline calculation right on the front end, so I guess I would cite to 3553EA, which requires an accurate calculation of the guidelines on the front end, and then we just have no certainty on the other way around. Brandon, I want to take you back to whether there was a proper enhancement here for just a second. When I counted the various things that this woman allegedly did, it seemed to me there were at least six things that she did, some of which were the acts of getting the money, others were the acts of concealing what she had done. Now, it seems to me that concealing acts clearly tie and relate to the acts of getting the money. It's less clear to me whether we use each act of money as one facilitating the other. I assume your position is no on that, but why? Well, I think that there— In other words, the fact she got the money the first time, did that affect her ability— falsely, did that affect her ability to get the money the second time and the third time or not? I mean, I think factually we can assume that she has an established relationship with the VA, but I don't think that it's fair to assume—I mean, the record is very clear, at least from both the district court's findings and the government's own witness, that this was a complete breakdown in due diligence on the part of the VA, so I don't think that we can really say that they're trusting her more or they're— But can somebody say, well, she started out small, $43,000. She does that. Then she moves up a little bit to $332,000, and then, well, I guess the last one was $258,000. I think it was $80,000, and then the first property was $80,000, and then there was a $43,000, and then a $200,000. I'm forgetting the exact numbers, but there was a first property, then a van, and then a second real property. All right. Yeah, she applied for $80,000, and she lied about the $43,000 or something like that. So in any event, there is at least a plausible claim that the government can make that one enhanced her ability to get the other. I think it's plausible to say that she had established that relationship. I don't know that it's— So then why, particularly if clear error is the standard, why would it be error here to say that each one of these things is fairly innocuous, doesn't seem that complex individually, but collectively it is a complex scheme? I see my time is up. May I briefly answer? Yes. In this case, there's no way that each act, each clearly non-sophisticated act, according to the court, really compounds her ability to get these things. I mean, I think that there's nothing special about the first act that uniquely ingratiates herself. There's nothing special about the second act that builds on the first. There's nothing special about the third act that builds on the second and the first. There's no evidence that she wouldn't have been given the third if she hadn't had the first, other than we concede that there is at that point an established relationship. But it's not as though—Your Honor cites the concealment efforts. None of those even occurred until well after the fact. It's not as though even those concealment efforts are assisting her ability to get the next loans or grants in this case. But the scheme is to get the money and not get caught. Concealing is obviously part of that scheme. If that's the case, she did a lousy job of it, Your Honor, and certainly didn't take any efforts on the front end. I mean, she made some sort of hail Mary, dog ate my homework efforts at the end. You don't have a lousy criminal defense here. You can think about that, and you'll have your rebuttal. Thank you, Your Honor. Good morning to members of the court. Hilliard Hester for the U.S. Attorney's Office in Nashville in the Anderson case. As summarized in our brief, our posture is that the district judge, in analyzing the guidelines, made no error either under the clear error standard, which is my read of the jurisprudence of our circuit. Even if the court more closely analyzes this as being discreetly involved with the interpretation of the guidelines, there is still due deference that's due the district court's application of the guidelines as he found them to the facts of this case. And under either, we submit that Judge Campbell did not err in assessing the enhancement. It does seem clear, at least to me, that none of these individual steps seems to be particularly complex or sophisticated. Would you agree with that? I would, in fact. So then if we're looking at them in totality, the question goes back to the discussion with your opposing counsel, and that is, are these really tied together as some schemes are? You do a lot of different things, but you know you have to do them all together in order to succeed. Here it just seems like three different acts that really don't particularly relate together. I can address that, but I would have to mildly disagree that there is an absence of any complexity with respect to at least the first and the third scheme. And I will respond to the court's question about the interrelationship between these two, and I'll address that first. First of all, the second scheme, which was to get this specialty van, was related to the first in that it was purportedly to transport the residents of the first property. So there was a logic, if you will, that I think has been addressed, likely enhanced the credibility of her claim that she needed this van with respect to people that she was going to be responsible for. Does that add complexity? I'm responding to the interrelated aspect to it, and I think the final answer to that is yes, if the court agrees with the district court that when the totality of circumstances and the interrelationship between these things, the juggling, if you will, between the first fraud, the second fraud, and the third fraud, raised this case above the baseline of the mine run false statements, which can be accomplished simply by making a false statement, or the mine run theft of government property, which can be accomplished simply by snagging a treasury check out of the mailbox. What we've got is a lot more activity before, during, and after the crimes were committed in this case, that in totality elevated this to one under the guidelines. What are you referring to when you say a lot more? She made the false statements three different times, so what in addition to that comprises your a lot more? In the first fraud with the VA, she made a false claim that she had the money in hand. To support that false assertion, she committed a completely separate fraud to obtain a loan, a loan to obtain the money that she claimed was in cash form. She lied about her income to the loan company. She lied about her credit worthiness, claiming the money that she had gotten from the VA was her retirement fund. She would not have gotten that loan but for that separate false claim. Absent getting the money from that fraudulent loan, she wouldn't have been able to close on the property, and VA would have found out about that and come down on her. So that secondary fraud elevates, I would submit, the initial commencement of the entire scheme in this case beyond the ordinary false claim. I just want to be candid. The guideline says it has to be especially complex. Judge McKeegan and I have had an enhanced sophisticated means case two days in a row, and we just keep hearing over and over on the totality. In both cases, the pieces of the scheme were pretty darn simple, but in both cases, we just keep hearing about the totality when you consider it together. But it's conclusory. I mean, it's just simple. I mean, big deal. So she gets the money for the car. I mean, it's so complicated to get the money for the car and then use it to maybe pay a mortgage payment over here. Like, oh, my God. Now we're talking really complicated. And I just want to be candid. I mean, it sounds conclusory to me, this totality stuff, and why is it especially complex? I think I could respond to that, Your Honor. The third scheme in which she got the largest amount of money, by that point in time, unbeknownst to the VA, she had defaulted after about a month on her mortgage payments for the first property in order to keep the VA from finding out about that because they were unaware that there were any third-party interests in this first piece of property, which there aren't supposed to be because it's supposed to be in service for veterans for seven years. She takes funds from the third fraud and applies it to repurchase, however briefly, the property that she defaulted on. So she circled back, if you will, from the third fraud to use funds to plow in in a pyramid-type effort to plow that back in to the first property to keep the whole scheme afloat and to avoid detection. And as Judge McKee pointed out earlier, there's also the considerations of concealment in this case. When the VA realized at the tail end, still unaware that the first property was no longer owned by the defendant and couldn't continue to be operated as intended for veterans, they confronted her about the failure to close on this third property, and she claims she's got cancer. She's being treated for cancer in order to hold them at bay, if you will, and to hold back their discovery of fraud and referral from that unit, which is untrained at fraud detection, to the people who are, which is the Inspector General's office. When the Inspector General's office gets involved and do a search on her house to try to find where this money went and where it is, she tells them, I've still got it. It's in a safe in New Hampshire, leading them to, in order to dispel that or perhaps hopefully discover where this money is, try to track down that claim. And so there were layers, if you will, both of her activities in acquiring the money, keeping the money over a duration of time and in repetitive fashion. And finally, to forestall, if you will, in an effort to however temporarily conceal the fact that she'd engaged in these frauds. So the bottom line is you're saying she took what otherwise was a pretty simple act and made it more complex by the additional stuff she did. That is it, Your Honor, and all these episodes are... Let me ask you another question, if I might. Yes, sir. I want to follow up on what Judge Hood was asking your fellow counsel about. It does seem to me... It seems to me that if the district judge had varied downward to the lower guideline range and sentenced at the bottom of the range, harmless error would be probably applicable in this case. But it also seems to me that he did say he was varying for several other reasons as well. So if that is the case and you're varying for other reasons, you've got to start from the right spot to start with. And if he didn't start from the right spot to start with, if we find it wasn't sophisticated, then it does seem to me we probably have to remand back for a do-over. Do you agree or disagree with that, if we find there was not sophisticated means? Well, no, I would not. I would not, respectfully. And the reason is the manner in which Judge Campbell indicated that he had arrived at the sentence. And I've got... This is at page ID 316. After he goes through... Well, first of all, if I may, I'm sorry to not finish my thought there, but I need to point out that counsel in his opening argument conflates the judge's findings and observations, the district judge's findings and observations about sophistication that were made during the 3553 analysis and what he was going to do with the guidelines in this sentence with his initial findings in which he was discreetly examining the guidelines. He started off in the guidelines lane, clearly shifted into the 3553 lane, and then after finding, well, under the guidelines sophistication applies, but under my criterion for a 3553 balance sentence, they don't. And he essentially jettisoned those after talking and addressing those, I think, fairly clearly. But where he ended up with was not a variance down to a level and then wrestle with where to go. What the district judge did, and this is set forth at page 316 of the record, page ID 316, is the bottom line is I think that what is sufficient but not greater is a sentence of 24 months. I am going to downward variance to level 17 for a 24-month sentence. In other words, he engaged in a variance sufficient to get to the sentence that he articulated after considering all the mitigating factors, including jettisoning, I would submit, the sophisticated means enhancement that we're discussing today. After jettisoning that, considering these other factors, he said, I think a fair sentence is 24 months. I'm going to vary sufficient to do that. So I think given the chronology of those findings, we do have, and I don't think the case law requires absolute certainty, which is, I believe, the terminology used by counsel with respect to evaluating harmless error. I think, and I don't have the text in front of me, but I think the cases are, if it's clear to the reviewing court that the district judge did not rely on the guidelines with respect to a contested issue in fixing sentence, I think that very clear and unequivocal assertion or statement, rather, by the district judge at page ID 316 makes it clear. He fixed the sentence and then determined the variance that was necessary to get to that sentence. And do you want to speak at all to this proposed amendment to the guideline? Well, the case law is clear that a district court can't be faulted for failing to foresee a proposed, this isn't even an amendment that's in place yet, and we don't know what the language of it is going to end up being, but whatever it ends up being, the district judge, I believe, to the letter, applied the examples and the language of the guidelines that were in place and in force at the time he fixed sentence in this case, and therefore there's no basis to find that he erred because of a potential amendment that's yet to take place. Thank you. Yes, sir. Let me please the court. Just to briefly address the court's concern about how these worked in tandem, I think the very first consideration is just the standard that the district judge was using to make that determination. The standard is wrong. I mean, his assumption about sophistication is legal error, and so he's viewing it through that lens when he says that together these were sophisticated. As he specifically stated, his view at that point is that sophistication or sophisticated means encompasses virtually all conduct. Yes, but you can't win on that by saying he committed error in the standard he applied, but by the way, I want you to use de novo review. So if we're looking at it afresh, whatever that means, then what is the matter with the argument that each thing here starting out, the application was pretty simple, but then she did do several more things arguably in connection with each one of these loans? Yes, Your Honor. We do look at it in a totality, don't we? We do look at it in a totality. So having said that then, speak directly if you would, whether these other things then collectively add up to sophistication. Well, I think the concealment efforts are really sort of flailing, desperate efforts. I don't know what reference her saying I have cancer has to her misuse of VA funds. I mean, these are really Hail Mary kind of excuse making, and as to money in New Hampshire, frankly, I think she still believes there's money in New Hampshire. I think that's an easier thing for her to believe than that she spent it on scratch cards, but that just goes to her having certain diagnosed mental problems that even the VA was aware of at the time of the loan or the time of the grants. But the issue of them sort of aggregating, I think that if you look at the Hance case, the Eighth Circuit case that we cited and the Adepoju case from the Fourth Circuit, they all involve conduct that you could look at, you could mash together and say, I mean, the district court could have made that exact same analysis on those cases, only those cases involved much more sophisticated behavior than Ms. Anderson did. And as the Fourth Circuit recognized, that sort of behavior, the realm of a special complexities and intricacies involves more than the forgeries, misrepresentation, and concealment inherent in bank fraud. They're saying just because you add together these things, it doesn't make them greater than the sum of their parts. And I think that's where you have to arrive in order to say that there's something special about this. And there's nothing special about this crime. It's, in fact, the sort of prototypical fraud against the VA. Thank you, Your Honors. Thank you. Case will be submitted. Please call our last case.